## JACKSON et al. v. CONNECTICUT GENERAL LIFE INS. CO. et al.

### No. 3516.

Court of Civil Appeals of Texas. Beaumont.
July 19, 1939.

Rehearing Denied July 26, 1939.

178

Shivers & Keith, of Port Arthur, for appellants.

Orgain, Carroll & Bell and Howth, Adams & Hart, all of Beaumont, for appellees.

O'QUINN, Justice.

At the time of his death, Dempsey Jackson had on his life a policy of insurance with Connecticut General Life Insurance Company in the sum of $4,000; Laura McGowan, described as "aunt", was the named beneficiary. Subsequent to the issuance of the policy, the deceased married Ida Jackson, and she was his wife at the time of his death. Mack Hannah was duly appointed administrator, the wife, and the named beneficiary all claimed the proceeds of the policy. Being in doubt as to its ownership, this suit was filed by Connecticut General Life Insurance Company against the three claimants praying that they be cited to appear in court and assert their respective claims, and that it be discharged with its costs, attorneys fees, etc. The claimants duly filed their answers; after filing her answer, Ida Jackson, the wife, filed a disclaimer. The issues between Laura McGowan, the named beneficiary, and Mack Hannah, the administrator, were submitted to the jury by the two following questions, both answered in the affirmative:

"Special Issue No. 1. From the preponderance of the evidence, do you find that Laura McGowan had a reasonable expectation of receiving pecuniary benefit or advantage from the continued life of Dempsey Jackson?

"Special Issue No. 2. Do you find from a preponderance of the evidence that after the marriage of Dempsey Jackson to Ida Jackson that Laura McGowan had a reasonable expectation of continued substantial pecuniary benefits, if any, from Dempsey Jackson?"

On the verdict, judgment was rendered in favor of Laura McGowan against Connecticut General Life Insurance Company for the proceeds of the policy, less the sum of $350, allowed the insurance company as a reasonable attorney's fee for filing the bill of interpleader. It was further ordered that Mack Hannah, the administrator, "take nothing"; from the judgment he has regularly prosecuted his appeal to this court.

We concede appellant's point that, to recover, notwithstanding she was named by the deceased the beneficiary of his policy, Laura McGowan rested under the burden of establishing "an insurable interest" in the life of the deceased. Finn v. Metropolitan Life Ins. Co., Tex. Civ.App. 16 S.W.2d 922, by Supreme Ct. Wilke v. Finn, 39 S.W.2d 836, 837. It is further conceded that the relation of "aunt" and "nephew" between Laura McGowan and the deceased was not sufficient of itself to establish the issue of insurable interest. American Nat'l Ins. Co. v. Wallace, Tex.Civ.App., 210 S.W. 859; First Nat'l Bank v. Livesay, Tex.Civ.App., 37 S. W.2d 765, affirmed Tex.Com.App., 57 S.W. 2d 86, 91 A.L.R. 873; O'Connor v. O'-Shaughnessy, Tex.Civ.App., 288 S.W. 842; Price v. Supreme Lodge Knights of Honor, 68 Tex. 361, 4 S.W. 633; Wilton v. New York Life, 34 Tex.Civ.App. 156, 78 S.W. 403; 37 Corpus Juris., 394; 15 Ruling Case Law 922. To establish the issue of "insurable interest" in her favor, Laura McGowan rested under the burden of establishing the affirmative of the issues submitted to the jury. These issues were raised by the evidence and have full support in the evidence; so, the court did not err in refusing to instruct a verdict in favor of the administrator, nor in refusing to render judgment in his behalf non obstante veredicto. The following summary

of the evidence supports the jury's verdict: The evidence showed the relationship of consanguinity and affinity between appellee and the deceased, Dempsey Jackson; that Laura at different times married two of deceased's uncles; that Dempsey himself was related by blood to Laura through Dempsey's mother; that after Dempsey's father died Laura gave him a home and supported him and always treated and regarded him as a son and that he looked upon her and frequently spoke of her as his mother; that after Dempsey became old enough to work he in turn regularly contributed money to help support and maintain his Aunt Laura and had been thus contributing to her support all along and practically right up to the time that he was stricken with his last ailment, which resulted in his death; that during practically all of his life and for many years when he became sick, from time to time, he called for Laura's assistance and that Laura always and invariably went to him and provided medicines and doctors, when necessary, and personally nursed him back to health. Odelia Alfred, the woman with whom he had been living for about two years immediately preceding his death, testified that he, Dempsey, had stated that he wanted his Aunt Laura to have the benefit of the insurance policy and that even if she and Dempsey later got married, it was his intention not to make any change with respect to who should be the beneficiary in the policy. Ida Jackson, the wife of the deceased, testified:

"Q. Did Laura McGowan, this woman sitting over here, cause any trouble between you and Dempsey Jackson that caused you all to separate? A. Yes, sir.

"Q. What was the trouble? A. Well, she would come over every pay day, back and forth, and just kept the home stirred up all the time and nothing I could do to get along.

"Q. She always asked for money? A. For money and to support her."

Melissy Johnson testified that she had lived at Port Arthur about twenty-one years, knew Dempsey Jackson in his lifetime and that Dempsey lived in the witness's home and had rooms there after Laura McGowan moved to Houston; that she met Dempsey at Laura's home and that he was living with Laura at that time and that when Laura and her husband were going to move to Houston they made arrangements with her for Dempsey to stay at her house and for Dempsey to have a room there; that after Laura moved to Houston, Dempsey Jackson would send her money when he was working and that she wrote the letters and sent the money off for Dempsey; that Dempsey himself could not write and that he would get the witness to write the letters for him; that Dempsey paid room and board at her house; that every pay day of every month she had to write for him to Laura and send some money, and that she would write and read his letters; that the highest amount the witness ever sent to Laura for Dempsey was $15 and on down; that Dempsey was sick a good deal the latter part of his life and complained of stomach trouble, and whenever he got sick she would send Laura a telegram, and Laura would come; that Dempsey asked her to send the telegrams; that she had sent many telegrams when he was sick like that; that Dempsey died on the 13th day of May, 1938, at Port Arthur, and that Laura McGowan was with him when he died, and that she was right with him all along; that Ida Jackson (Dempsey's wife) was not present when Dempsey died, but that she was in California; that Laura always came over whenever she was sent telegrams, and would stay at the witness's house and would wait on Dempsey and take him home with her and keep him until he got well and he would come back; that Dempsey "always taken her (Laura) as his mother and he would tell me to write to her to come, and if he would be too sick when he was at my house he wanted to go home, cried to go home with her and she would take him"; that he would go home with her and stay until he was better, and after he would go and stay with her he would come back looking well; that they called Dempsey Jackson just "Dump"; that when Dempsey was sick he could not work for a spell, and Laura would write him and come to his rescue as soon as he got sick and Dempsey "would want us to send for her and she would come with her money and everything else to him"; that right up to the last when he was sick and just before he died in May, Laura McGowan arranged for the hospital and also arranged for his doctors, and for the pay of the doctors and the hospital; that Laura also arranged for medicines to be used in his last sickness before he died; that Dempsey had a half brother living named George Ivory and that Laura McGowan is taking care of him and has been taking care of him for sometime; that George Ivory is para-

lyzed and that he has been with Laura for "a good while"; that Dempsey Jackson knew that his Aunt Laura McGowan was clothing and feeding his paralyzed half brother, George Ivory; that George Ivory first stayed with Dempsey and then went to live with Laura and Laura would bring George Ivory over (meaning to Port Arthur) when she came over to see Dempsey; that when he left Dempsey he went to live with Laura McGowan; and that she had actual knowledge of all of these facts. She further testified that Dempsey Jackson "told me Laura never did charge him a penny for board and room and she always seemed like his mother to him, and that is what he told me, and did by him like a mother"; and that the witness never did say anything contrary to that statement in the relations between Laura McGowan and Dempsey Jackson.

■ The finding of the jury that Laura McGowan had a reasonable expectation of receiving pecuniary benefits or advantages from the "continued life of Dempsey Jackson," and the further finding that, after his marriage to Ida Jackson, Laura McGowan had a reasonable expectation of continued substantial pecuniary benefits from Dempsey Jackson, established in favor of Laura McGowan the issue of insurable interest. Smith v. Metropolitan Life Ins. Co., Tex.Civ.App., 123 S.W.2d 956.

■ Appellant complains that the court erred in refusing to submit to the jury the following issues, duly prepared and duly requested by him: (a) "Do you find from a preponderance of the evidence that Laura McGowan received substantial pecuniary benefits from Dempsey Jackson after his marriage to Ida Jackson?" This requested issue was based upon the following testimony by appellant's witness, Sam Osborne:

"Q. Did you ever see him send her any money? A. No, sir.

"Q. Do you know of any particular occasion when he did send her money? A. No, sir.

"Q. Did you have any conversations about the money he saved? A. Well, several other times he would speak of that.

"Q. Tell us what he said at that time? A. Well, he always told me that he had to start saving up his money and quit throwing it away so he could go and get his wife and children back to Port Arthur, if he liked it over there he would stay and he said his kin folks separated him.

"Q. Did he tell you he was not going to send his kin folks any more money? A. That is what he told me, he would not send them any more.

"Q. Do you recall when was the first time he told you that? A. He told me that when my sister first left. I guess about a couple of years before he died, when they separated.

"Q. Did you see him several times after that? A. Yes, sir, I saw him lots of times after that.

"Q. Did he ever tell you he had sent them money after that first time he told you he was not? A. No, sir, he didn't."

Appellant had the right to an affirmative submission of any issue, raised by his pleadings and evidence, and which, if found in his favor, would have established his defense that Laura McGowan had no insurable interest in the life of the deceased. Montrief & Montrief v. Bragg, Tex.Com. App., 2 S.W.2d 276; Southland Greyhound Lines v. Cotton, 126 Tex. 596, 91 S.W.2d 326; Traders & Gen. Ins. Co. v. Garry, Tex.Civ.App., 118 S.W.2d 340. This requested issue was in substance submitted to the jury by special issue No. 2. Besides, the testimony of Sam Osborne, as to what the deceased told him, did not raise a fact issue against the testimony of the wife, Ida Jackson, as to the contributions made by the deceased to Laura McGowan.

(b) "Do you find from a preponderance of the evidence that such substantial pecuniary benefits, if any you have found, were for the support of Laura McGowan?"

(c) "Do you find from a preponderance of the evidence that such substantial pecuniary benefits, if any you have found, were not only gifts?"

All the evidence was to the effect that the contributions made by the deceased to Laura McGowan were for her support, and there was no testimony raising the issue that the contributions were not for her support and were "only gifts," as distinguished from contributions for her support.

(d) "Do you find from a preponderance of the evidence that Laura McGowan, immediately prior to the death of Dempsey Jackson, had a reasonable expectation that such substantial pecuniary benefits, if any, would continue?"

Appellant brings forward the testimony of Sam Osborne, as copied above, as the basis for this requested issue. Again, we say, as against the testimony of the wife, Sam Osborne's testimony did not raise the negative of the issue thus requested.

Appellant complains that the jury, in deliberating upon its verdict, decided, first, that Laura McGowan was entitled to the proceeds of the insurance policy and that they were going to give it to her, and then proceeded to answer special issues Nos. 1 and 2 so as to effectuate this agreement. Only two of the jurors testified, Mr. Young and Mr. Norton. We give the following summary of the testimony of Juror Young:

"After the jury went out and selected their foreman, the first thing that happened was the jury read the special issues, and that next the discussion commenced how we were going to decide the case, who was to get the money. Everybody was favorable to giving it to Laura McGowan, except one man, when it was first discussed. After a short discussion that juror, he seemed to be somewhat bemuddled and uncertain, decided he was wrong, and then all of us decided to give the money to Laura McGowan, that then the foreman of the jury got the special issues and answered them 'Yes.'

"When the lawyers got through arguing the case I knew 'what the effect of those answers would be as to who would win that law suit before I ever went back into the jury room.' I 'knew how to answer them.' I knew if we answered them 'Yes', Laura McGowan would win, and if we answered them 'No,' the woman who said she was Dempsey's wife would win. I believed, from the greater weight of the credible testimony I heard, there in the trial that I should answer Issue No. 1, 'Yes.' When the foreman wrote 'Yes' to that question, he wrote it, as far as I was concerned, on the preponderance of the credible evidence. Any agreement that was reached between the jury as to who would prevail in this law suit didn't effect my verdict one way or another, before we left the jury box to consider our verdict I had already determined that both of the issues submitted by the court should be answered 'Yes'; 'as simple as those two issues were,' after hearing the attorneys on both sides argue the case, I knew how to answer the questions,

and that I answered both questions 'Yes' from the preponderance of the evidence and in accordance with the court's charge."

In substance, Juror Norton gave the same testimony as Juror Young.

 We do not agree with appellant's construction of the testimony of these two jurors. It does not compel the conclusion that the jury, first, decided to give the money to Laura McGowan, and then answered the questions to effectuate their agreement. True, they agreed that she should have the money, but they testified that they answered the questions on the evidence, and before going into the jury room knew what their answers would be, and the effect of their answers. On the following authorities, the testimony did not establish reversible error: Texas Employers' Ins. Ass'n v. Chocolate Shop, Inc., Tex.Com. App., 44 S.W.2d 989; Texas Employers Ins. Ass'n v. Chocolate Shop, Inc., Tex.Civ. App., 30 S.W.2d 416; Monkey Grip Rubber Co. v. Walton, 122 Tex. 185, 53 S.W.2d 770, 771.

Upon a careful review of all the testimony, it is our conclusion that, as a matter of law, Laura McGowan established in her favor the issue of "insurable interest"— the affirmative of the two issues submitted to the jury. Therefore, even if the jury was guilty of misconduct in its deliberations, the error was harmless.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.