## BISCOE v. PRICE.

No. 5937.

Court of Civil Appeals of Texas.
Texarkana.

July 9, 1942.

Rehearing Denied July 30, 1942.

John D. Glass, of Tyler, for appellant.
Jones & Jones, of Mineola, for appellee.

WILLIAMS, Justice.

Rice Price, plaintiff below, one of six children of Rice Price, Sr., and wife, both deceased, executed and delivered to Ogden Biscoe, defendant below, a deed which purports to convey to defendant the undivided 1/6 interest of plaintiff in a 116-acre tract of land near Hawkins, Texas, in fee simple with general warranty of title. The deed recites a consideration of $200 cash. A clause provides that grantee pay the delinquent taxes due on the interest conveyed. It is dated in August, 1929, and was filed for record in November, 1929. Plaintiff in this suit filed October 22, 1940, pleaded a trespass to try title action in statutory form

and further alleged that at the time of its execution and delivery plaintiff and defendant intended and understood said instrument to be a mortgage to secure a debt. Plaintiff alleged the amount due on the debt with interest to date of trial amounted to $367.66 which was tendered into court, and prayed for cancellation of the instrument as a deed and for title and possession. Defendant answered with demurrers and denials and plea of not guilty.

In response to special issue No. 1, the jury found "that at the time of the execution of the *deed, Rice Price understood and intended it* to be only a lien or mortgage upon the land to secure a debt owed by Rice Price to Ogden Biscoe"; and to No. 2, "that at the time of the execution of the *deed, Ogden Biscoe understood and intended it* to be only a lien or mortgage upon the land to secure a debt owed by Rice Price to Ogden Biscoe." (Italics ours.) Upon these findings, the only issues submitted, the court entered judgment which cancelled the instrument as a deed and awarded plaintiff title and possession to the land, and defendant judgment for the $367.66.

Defendant attacks the sufficiency of the evidence to support above findings, and related thereto assigns as error the court's refusal to set aside the findings and grant a new trial because of alleged jury misconduct in reference to issue No. 2.

At the time of the execution of the instrument, plaintiff lived in San Angelo; his brother Archie and his sister Lula occupied the two houses on the 116-acre tract, and defendant, the daughter of Lula, resided in Tyler, Texas. In the early part of 1929 the Hawkins Bank recovered a $116 judgment against plaintiff. The bank's threat to levy upon and sell plaintiff's interest in the farm caused both Lula and Archie to write plaintiff in a move to keep any white man from obtaining plaintiff's interest in the place. According to Lula's testimony, plaintiff replied that he did not intend to return and that if defendant would pay off the judgment, take up the back taxes and give him credit for $40 he had borrowed from defendant, the latter could have his interest. Defendant claims that in response to such information she ascertained the amount of the judgment and delinquent taxes, had the instrument prepared by a lawyer in Mineola and mailed the deed to plaintiff at San Angelo. After its execution plaintiff returned it by mail to defendant. Archie claims he contacted defendant in person

and she agreed to settle off the judgment and take a mortgage from plaintiff on the land to secure her, and that he so wrote plaintiff. Plaintiff claims a letter to the latter effect from defendant accompanied the deed when it was mailed to him. It is without question that various letters passed between these parties, and that all negotiation which lead up to the execution of the instrument was conducted by mail. All these letters have been lost, stolen or destroyed. The testimony given by plaintiff and Archie is directly contrary to that given by defendant and Lula in regard to the contents of these letters.

 Following the execution of the deed, defendant on August 31, 1929, paid off the judgment. In December 1929, she paid delinquent taxes in the amount of $114.32, and in 1932 paid delinquent taxes for other years in the amount of $110.94, all of same being on 86 acres assessed in the name of Rice Price, Sr.'s estate. The remainder of the 116 acres had been assessed for above years to Archie and paid by him after delinquency in December 1940. In December, 1940, after discovery of oil in the area and after suit was filed, plaintiff paid delinquent taxes on $14\frac{1}{3}$ acres for the years 1927, 1931 to 1935, inc., 1937, 1938, and 1939. The evidence does not disclose who rendered any part of the land for taxes either before or after the execution of the deed in 1929. One witness valued the land in 1929 at $6 an acre; others valued it at $30 to $35 an acre. According to testimony of plaintiff's wife and daughter, defendant declined to accept payment of the alleged amount due by plaintiff, saying she did not need the money then, loved plaintiff and his child, and it was all right to let it run. All this defendant denies. Plaintiff and defendant were on good terms until a disagreement arose over an automobile in 1939. Plaintiff worked for defendant for wages in the latter's cafe, beginning in 1930, for several years. Plaintiff moved back on the tract in 1939, if not before. "Discarding all adverse evidence and giving credit to all evidence favorable to the plaintiff and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved," as the rule is stated in 17 T.J. p. 949, with authorities there collated, we would not be authorized to disturb the jury's findings and hold as a matter of law that there was no evidence to support above findings.

After the jury had agreed upon and answered issue No. 1 "Yes", they proceeded into a consideration of issue No. 2. It is without controversy that in the "first early consideration of issue No. 2, at least six or seven of the jurors wanted to answer 'No', had spoken up and going to sign 'No'." According to juror Attaway, "Most every one wanted to answer 'No', the jury had decided to answer 'No' to that question, when several of the jurors stated that their verdict would be in a position of a hung jury if you didn't answer both (questions) 'Yes' or 'No'; if we answered one 'Yes' and the other one 'No', we would be just like it was when we started." It is further without dispute that the jury made an effort to get information from the trial judge as to whether it would be a hung jury if they answered one issue "Yes" and the other "No". The trial judge had returned to Tyler. After the jury had been so informed by the bailiff, they proceeded with their deliberations, and shortly afterwards a lawyer who had been agreed upon by counsel received their verdict.

The effect resulting from the statements that it would be a hung jury if they answered one issue "Yes" and the other "No" is reflected in the following questions and answers:

"Q. After a discussion of the testimony on the issue, Mr. Attaway, then you agreed to answer that question 'Yes' (No. 2)? A. Yes, sir; we all agreed.

"Q. And the reason you agreed to answer 'Yes' was because you thought under the testimony it ought to be answered 'Yes'? A. I don't know. I was pretty sold on 'No' on the question, the way I understood that question was asked.

"Q. You had that discussion in your mind about the proposition of a hung jury if both not answered 'Yes'? A. Yes, sir. That is the way they felt about it. The way the question was asked, didn't seem like they were any that could explain it. I believed it would be a hung jury if one answered 'Yes' and the other 'No.'

\* \* \* \* \*

"Q. Did the fact that you men were all anxious to get away, coupled with this discussion and opinions expressed, that if you answered one of them 'No' and one of them 'Yes', you would be in a position of a hung jury, have anything to do with your changing your vote on special issue No. 2, Mr. Lee? A. I didn't know. In a way, it might and it might not. Like I said, that was my first time to ever be on a civil jury.

"Q. Did you believe when these other jurors expressed that opinion, did you believe that was probably right? A. That is what we called the judge for. I didn't understand it, in a way.

"Q. After you couldn't get the judge, did you finally conclude they may be right about it? A. Sure.

"Q. You did finally answer it 'Yes'? A. Yes, sir; we finally answered 'Yes'.

"Q. And the reason why you agreed for it to be answered 'Yes', was, after discussing the testimony, you thought the testimony warranted it to be answered, didn't you? A. I didn't know exactly, but thought maybe that was right.

"Q. From the testimony? A. For that question, didn't understand. I thought to keep from being a hung jury that was right.

"Q. That is why you agreed to it, you thought it was right under the testimony? A. Yes.

"Q. When you finally agreed to answer the issue 'Yes', you had in mind that discussion about it being a hung jury if you didn't answer both right, didn't you, Mr. Lee? A. To some extent I did; yes, sir."

This testimony, in our judgment, gives rise to a reasonable doubt as to the effect of above-described misconduct upon at least these two jurors, if not more, in their agreement to answer issue No. 2 "Yes." The effort of the jury to contact the trial judge and find out whether or not their answers would be conflicting or a "hung jury", as they expressed it, would not have arisen, and the remarks by some of the jurors that a "Yes and No" answer would be conflicting would not have been made if at the time all the jurors had been in favor of answering issue No. 2 "Yes." It is apparent from the evidence first above set out that a negative finding of this issue would not have been without support in the evidence. A negative finding to such issue would have defeated recovery for plaintiff and it was a material issue. Davis v. Brewster, 59 Tex. 93; Webb v. Burney, 70 Tex. 322, 324, 7 S.W. 841; 29 T.J. 802; Young v. Blain, Tex.Com.App., 245 S.W. 65. When misconduct is once shown, as here, and "there is reasonable doubt as to the effect of misconduct upon \* \* \* the decision of any material issue, the doubt will be resolved against the verdict." 41 T.

J. 837. Such rule applied to this record as a whole requires a reversal of the verdict. Moore v. Ivey, Tex.Com.App., 277 S.W. 106; Bradshaw v. Abrams, Tex.Com.App., 24 S.W.2d 372, 374, and authorities there collated. Southwestern Transp. Co. v. Medley, Tex.Civ.App., 71 S.W.2d 916; Allcorn v. Ft. Worth & R. G. R. Co., Tex.Civ. App., 122 S.W.2d 341.

The judgment will be reversed and the cause remanded.