RICE PRICE V. OGDEN PORTER BRISCOE ET AL.

No. 8043. Decided April 14, 1943.
Rehearing overruled May 19, 1943.
(170 S. W., 2d Series, 729.)

*Jones & Jones*, of Mineola, for petitioner.

A juror may not impeach the verdict duly returned into court by testifying that he misunderstood or had the wrong impression as to the effect of the answers made to special issues, and that he would not have agreed to the answer given in such issues if he had known the legal effect thereof. Carl Construction Co. v. Bain, 235 Ky. 833, 32 S. W. (2d) 414; Bradshaw v. Abrams, 24 S. W. (2d) 372; Traders & Gen. Ins. Co. v. Lincecum, 130 Texas 220, 107 S. W. (2d) 585.

*John D. Glass,* of Tyler, for respondent.

The Court of Civil Appeals correctly reversed and remanded the case because of the misconduct which occurred, and the misconduct was not as indicated in petitioner's brief and was not merely an unauthorized or improper attempt of jurors to impeach the verdict. Southern Trac. Co. v. Wilson, 254 S. W. 1104; Kindle v. Armstrong Packing Co., 103 S. W. (2d) 471; Dallas Ry. & Ter. Co. v. Starling, 130 Texas 379, 110 S. W. (2d) 557.

MR. JUDGE BREWSTER delivered the opinion of the Commission of Appeals, Section A.

This is an action in trespass to try title brought by Rice Price, petitioner, against Ogden Porter Biscoe (and her husband), respondent, for the title and possession of an undivided 1/6th interest in 116 acres of land and to cancel a deed executed on August 29, 1929, by petitioner conveying said undivided interest to respondent. Petitioner alleged that said deed, although absolute on its face, was in fact only a mortgage to secure an indebtedness due by him to her.

Only two issues were submitted to the jury. The first inquired whether petitioner understood and intended the deed to be only a mortgage. The other presented the same inquiry as to respondent. Both were answered in the affirmative. Thereupon the trial court entered judgment awarding petitioner recovery of the land and respondent recovery of $367.66 against petitioner, that being what he owed her, plus interest, on the "mortgage" debt. That judgment was reversed and the cause remanded by the Court of Civil Appeals at Texarkana. 164 S. W. (2d) 67.

Four points of error assigned here present only the question of jury misconduct, which was the ground for reversal by the Court of Civil Appeals.

The alleged misconduct occurred during the jury's consideration of the second special issue. It is claimed that some of

the jurors wanted to answer it "no" and that it was argued by some that such an answer would create a conflict with the first special issue, which had been answered "yes," thereby resulting in a "hung jury" and a delay in their getting home. It is alleged that because of this argument special issue No. 2 was finally answered "yes."

After hearing the testimony presented on respondent's motion for a new trial, the trial court overruled the motion. No request was made for findings of fact and conclusions of law, and he made none.

At this hearing only four witnesses testified, all of whom were called by respondent. Three of them were jurors. The fourth was the bailiff who had charge of the jury. Attaway, Lee and Gilbreath were the jurors. Their testimony presents many conflicts and inconsistencies as to what happened, when it happened and as to its effect. For example, Attaway testified in part:

"Q. When they asked for the judge—before they asked for the judge—had some of the jurors indicated a desire to answer, in their minds, answer to special issue No. 2 should be 'No'?"
"A. Some of them said it would be a hung jury. They said it would be, by answering one of them 'yes' and the other 'no.' They said 'No, that wouldn't do,' would be a hung jury just like it stated; read and discussed right smart bit and finally centered on 'no'."
"Q. Finally settled on 'no' "?
"A. I mean 'yes'."
"Q. Both answers 'yes',"
"A. Yes, sir."

 ✻  ✻  ✻  ✻  ✻  ✻  ✻

"Q. Had you been one of the jurors who was convinced at that time that the proper answer to that issue was 'no'?"
"A. I tell you the way I seen it. It was 'yes' and 'yes' for the two questions for my part. That is the way I understood it."
"Q. That it was necessary to answer both questions 'yes' or both 'no'?"
"A. No, both 'yes'."

 ✻  ✻  ✻  ✻  ✻  ✻  ✻

"Q. You remember how those issues were at this time"?
"A. I have it wrong, on the last. It was 'yes' and 'no'. They were both answered 'yes,' weren't they"?
"Q. Yes, sir."

"A. Last answer to question 'no,' that is the way it was centered on."

\*   \*   \*   \*   \*   \*   \*

"Q. What was the situation—believe you testified the jury was anxious to get away. What was the situation reference to members of the jury not desiring under any circumstances of having a hung jury so you would be delayed in going to your homes?"

"A. Well, I don't know just what there was brought up about that. That question there about the only question we spoke about."

· Then he testified that someone suggested they send for the trial judge to find out if an answer of ·"yes" to the first issue and "no" to the second would result in a hung jury; that, upon being informed that the judge was not immediately available, the jury began a discussion of the evidence on the second issue and decided upon an answer of 'yes' in about fifteen minutes.

"Q. After you discussed the evidence on the issue, then you decided—all jurors decided to answer the question 'yes'?"
·"A. Yes, sir."
"Q. And you answered it 'yes'? You agreed to answer it 'yes'?
"A. Yes, sir."
"Q. Your decision to answer it 'yes' was based solely and wholly on the evidence you heard in the case"?
"A. Yes, sir; that is—that second question, answering it 'yes.' That is the way I understood it was 'no' but that is what the argument come up about, 'no' and 'yes.'
"Q. You did discuss the testimony after the argument came up?
"A. Yes, sir."
"Q. After a discussion of the testimony on the issue, then you all agreed to answer that question 'yes'?"
"A. Yes, sir, we all agreed.

\*   \*   \*   \*   \*   \*   \*

"Q. Were you influenced in answering the question by that discussion that you would have a hung jury if you didn't?"
"A. No, I was not really influenced by that. The way the question was asked, didn't seem like there were any that could explain it."

Juror Lee testified that after answering the first issue "yes," the jury started discussing the second and took several votes without a decision.

"Q. What was the situation reference to Special Issue No. 2 at that time?"

"A. Really didn't understand it at that time to answer."

"Q. Anything said at that time, during the deliberations on special issue No. 2, were any comments made or opinion expressed by members of the jury to this effect: that it would be necessary, that they would be in the position of a hung jury and back where you started in answering that 'no' after answerin special issue No. 1 'yes' "?

"A. Something said to that effect."

He said they then decided to ask the judge about the matter, but were told that he had gone to supper; that they then renewed discussion of the second issue and finally agreed on an affirmative answer.

"Q. Did the fact that you gentlemen were all anxious to get away, coupled with this discussion, comments and opinions expressed, that if you answered one of them 'no' and one of them 'yes,' you would be in position of a hung jury, have anything to do with your changing your vote on that special issue No. 2, Mr. Lee?"

"A. I don't know. In a way, it might and might not. Like I said, that was my first time to ever be on a civil jury."

Gilbreath testified that after the jury agreed on the answer to the first issue, they divided on the second.

"Q. Then did someone in the jury room, some member of the jury or more than one, at that time, make the remark or express the opinion or discuss the question from this angle: that if you answered one of the issues 'yes' and one 'no,' you would or might be in the position of a hung jury?"

"A. No, I don't think so. That was after we had come to our verdict. My best recollection, after we had rendered our verdict, someone said something to that effect."

✻ ✻ ✻ ✻ ✻ ✻ ✻

"Q. Wasn't that the situation that came up when you sent for the judge to inquire whether the verdict would be acceptable if one answered one way and the other the other?"

"A. I just don't remember. There were two, can't recall which it was—said they didn't understand it and the foreman just remarked 'we will call the judge up here'."

Again, he said that after they had discussed the second issue a while, some jurors did not understand it and they wanted to

ask the court some question about it; that it was then that the unsuccessful effort was made to find the judge.

The bailiff testified that when the jury called for the judge, he told them the judge had gone to supper but that "I could get him mighty quick if they wanted to speak to him"; that the jury replied, "Never mind"; that they had their verdict in about thirty minutes thereafter.

■ The indefiniteness, the contradictions, the conflicts, the inconsistencies in the testimony of the jurors·prove the soundness of the rule announced in Monkey Grip Rubber Co. v. Walton, 122 Texas, 185, 53 S. W. (2d) 770, "When a trial court hears the testimony of jurors on an issue of misconduct, * * * he is accorded the same latitude in passing upon the credibility of the witnesses and of the weight to be given their testimony as the jury had upon the trial of the original cause. If there be any inconsistencies or contradictions in the testimony of a witness upon the hearing of a motion for new trial, it rests within the sound discretion of the trial court to harmonize and reconcile such conflicts so far as possible. *A juror's testimony upon such hearing may be so contraditory and inconsistent that the trial court in exercising its privilege to pass upon the credibility of the witness may be justified in disregarding his entire testimony.*" (Italics ours.) That case further states that, in such situation, the trial judge may accept the testimony given on cross examination or he may disregard the whole of it. Then it is said that when the juror so testifies as to justify the trial court in disbelieving his testimony, the complaining party should introduce other jurors as witnesses; that, if he fails to do so, he is in no position to complain.

In view of the character of the testimony in this case, the trial court could either disregard entirely the testimony of Lee and Attaway or he could believe the testimony of Gilbreath that the discussion as to conflict occurred after the verdict had been reached. Either finding would support his order overruling the motion for a new trial, and his finding is conclusive in the appellate courts. International & G. N. R. Co. v. Hawthorne, 131 Texas 622, 116 S. W. (2d) 1056; Texas & P. Ry. Co. v. Foster (Civ. App.), 58 S. W. (2d) 557 (er. dism.).

■ Nothing said herein is to be taken as any modification of the rule that a juror may not impeach or destroy his verdict by testifying to the mental processes by which he reached it.

It follows that we reverse the judgment of the Court of Civil Appeals, and affirm that of the district court.

Opinion adopted by the Supreme Court, April 14, 1943.

Rehearing overruled May 19, 1943.