BUCKALEW et al. v. BUTCHER–
ARTHUR, Inc. et al.

No. 4514.

Court of Civil Appeals of Texas. Beaumont.

Sept. 30, 1948.

Rehearing Denied Oct. 20, 1948.

Pitts & Liles, of Conroe, Thos. A. Wheat, of Liberty, and Jeff Cochrau, of Cleveland, for appellants.

Vinson, Elkins, Weems & Francis, and Thos. J. Lawhon, all of Houston, and H. S. Lilley, of Cold Spring, for appellees.

WALKER, Justice.

This action is in Trespass to Try Title. The subject matter of the litigation is the title to a 40 acre tract in the William M. Logan 369 acre Survey, formerly in Polk County but now in San Jacinto County, and the proceeds of oil and gas produced from said 40 acres tract.

The action before us is a consolidation of two pending actions. The parties in the trial court may be grouped as follows: (1) The heirs of Ellen Buckalew, wife of J. A. Buckalew; (2) the heirs of G. W. Wright and wife, T. E. Wright. Of this group, Ruth Wright McPherson and Ruby Wright Lilley and some others asserted a ground of recovery in addition to that asserted by the group as a whole, which Mrs. McPherson and Mrs. Lilley have made the subject of a Point of Error in this Court. (3) W. S. Childerss and wife, and (4) Butcher-Arthur, Inc., claiming an oil and gas leasehold, and various persons claiming oil payments under leasehold assignments in Butcher-Arthur's chain of title.

The two actions of which the present action is a consolidation were brought, one by the Buckalew heirs and the other, by the Wright heirs. The Buckalew heirs repleaded after the consolidation and made the other parties defendants. They alleged title to an undivided one-half of the 40 acres tract, specially pleaded title under the 5 and 10 years statutes of limitation, and prayed recovery of title and possession, rents, and one-half of the value of the oil and gas produced from the land in suit.

In response to this pleading the Wright heirs filed a plea of not guilty, They also seem to have used their original petition as one of their trial pleadings; this instrument does not refer to the Buckalew heirs but names W. S. Childerss, Butcher-Arthur, Inc., and the oil payment claimants as defendants. It contains three counts. Count 1 is in the form usually filed in Trespass to Try Title; title to the entire tract is alleged and limitation title under the 5 years statute is specially pleaded. Count 2 alleges that the deed under which the named defendants claimed title was a forgery. This deed was executed by the widow and ten of the twelve children of G. W. Wright, who described themselves as the "sole heirs at law of G. W. Wright, deceased". It is alleged in County 2 that the grantors named in this deed intended

only to convey a 55 acre tract which is not involved in this action; that when this deed was executed it contained no description of the land to be conveyed thereby; that later a description, not only of the 55 acres but also of the 40 acres in suit was written into this deed; and that the 40 acres was added without grantors' consent. Count 3 alleges that several of the grantors named in the aforesaid deed were minors when that deed was executed, and expresses a disaffirmance of said deed in behalf of said persons and their successors in title. The named plaintiffs prayed recovery of title to and possession of the 40 acres tract, rents and the value of the oil and gas produced from said land, and for the cancellation of the deed from Mrs. Wright and her children to Hines.

The pleadings of W. S. Childerss, Butcher-Arthur, Inc., and the oil payment claimants need not be described.

The consolidated cause was tried to the court, sitting with a jury, and such parts of the jury's verdict as are relevant are referred to below. On this verdict the Trial Court rendered judgment that the Buckalew and Wright heirs take nothing against W. S. Childerss, Butcher-Arthur, Inc., and the oil payment claimants, and both groups of heirs have appealed.

The Survey was patented to William M. Logan on July 14, 1849. Title out of the patentee by grant, devise or descent was not proved; and Butcher-Arthur, Inc., argues that the judgment must stand because title is thus shown to be outstanding in the patentee or his heirs. The argument need not be adjudicated; we may assume, without deciding, that appellants proved N. R. Dobson to be the common source of title the said N. R. Dobson shown to be the same person as R. N. Dobson, the said N. R. Dobson was in fact the common source of the record chains of title exhibited by the various parties, and the course of these several chains of title and the sources of the various claims made in the trial court were as follows:

(1) General warranty deed, dated Jan. 1, 1900, from the said N. R. Dobson and his wife, M. R. Dobson, to J. A. Buckalew, conveying the land in suit, subject to a vendor's lien.

(2) On the date of this deed, the grantee, J. A. Buckalew, was married to Ellen Buckalew and the beneficial title conveyed by said deed vested in the community estate of the said J. A. and Ellen Buckalew. Mrs. Buckalew died intestate in 1903, and the persons referred to by us as the Buckalew heirs are the heirs of Ellen Buckalew and assert title here to Ellen Buckalew's community interest in the land in suit. There was no administration had of Mrs. Buckalew's estate and no necessity for administration existed.

(3) General warranty deed, dated October 26, 1911, from J. A. Buckalew to G. W. Wright, conveying the land in suit, subject to a vendor's lien.

(4) On the date of this deed, G. W. Wright was married to T. W. Wright. G. W. Wright died in November, 1918, and his wife died in February, 1942. No administration was had of their estates and none was necessary. The persons referred to by us as the Wright heirs are all of the heirs of Mr. and Mrs. Wright, with the possible exception of one Will Whatley, the surviving husband of a daughter of Mr. and Mrs. Wright.

(5) General warranty deed, dated August 2, 1919, from Mrs. T. E. Wright, widow of G. W. Wright, and ten of the twelve children and Mr. and Mrs. Wright, to P. M. Hines, conveying the land in suit and a 55 acre tract as well. This is the deed attacked by the Wright heirs; and it described grantors as the widow and sole heirs at law of G. W. Wright. There is independent proof that the two Wright children who did not sign this deed, namely, Nora and Georgia Wright, who married Will Whatley, were dead when the cause was tried, but none as to when they died.

(6) General warranty deed, dated February 23, 1923, from P. M. Hines and wife, Ellen Hines, to V. W. McMurrey, conveying the land in suit.

(7) General warranty deed, dated June 27, 1924, from V. W. McMurrey to Wm. McMurrey, conveying the land in suit and other lands as well.

(8) Deed of exchange containing general warranties of title, dated September 19, 1931, entered into by Wm. McMurrey

and N. R. Dobson, whereby McMurrey conveyed the land in suit to Dobson, and Dobson conveyed to McMurrey a 30 acre tract in another Survey.

(9) General warranty deed, also dated September 19, 1931, from N. R. Dobson and wife, M. R. Dobson, to W. S. Childerss, conveying the land in suit and other lands, subject to a vendor's lien. The consideration recited is grantee's assumption of unpaid taxes, and of a debt owed by grantors to the Federal Land Bank of Houston, which is described as amounting to $962.54 and as being secured by a lien.

(10) Oil, gas and mineral lease dated February 2, 1945, from W. D. Childerss (Defendant Childerss) and wife, Verna Childerss, to DeWitt Gordon, covering the land in suit. This lease is in force, through production.

(11) Title to the leasehold interest under the aforesaid lease is vested in Butcher-Arthur, Inc., subject to oil payments reserved in various assignments under which Butcher-Arthur, Inc. claims title. The owners of these oil payments are among the defendants but need not be named.

The trial court submitted numerous special issues to the jury but the findings may be summarized in general terms as follows: (1) The preponderance of the evidence did not show that defendant Childerss had either actual or constructive notice of the community interest asserted by the Buckalew heirs when he took title to the land or (2) that Childerss' lessee Gordon had such notice when he took his lease, or that Gordon's assignee Berry, or that Butcher-Arthur, Inc., had such notice when these parties acquired their interests in the land. (3) Concerning the claim of the Wright heirs, the jury found that Mrs. T. E. Wright executed and acknowledged the deed to P. M. Hines on the date of said deed, to wit, August 2, 1919, at the same time as did her children Mark, Hosea, Ruth and Ruby. They found further that the description of the land in suit had been inserted in said deed before that deed was executed and acknowledged by said persons and that Mrs. T. E. Wright, Hosea Wright, Mark Wright, Ruth Wright McPherson and Ruby Wright Lilley did agree to sell the 40 acre Buckalew tract to P. M. Hines. (4) They found under Issue 30 that defendant Childerss had been in peaceable and adverse possession, etc., of a part of the land in suit, claiming the whole, for a period of 10 consecutive years prior to January 3, 1947, and found under Issue 31 that the preponderance of the evidence did not show that Childerss' use of a part of the land in suit was "subsidiary and incidental to the improvements" of Childerss on an adjoining tract.

These findings, thus summarized, also reflect theories upon which defendants Childerss, Butcher-Arthur, Inc., and the oil payment claimants founded their claim to the judgment rendered.

Each of the two groups of appellants has filed separate briefs, and we shall discuss first the three Points of Error filed by the Buckalew heirs, two of which have been adopted by the Wright heirs.

Buckalew Point 3 reads: "The trial court erred in overruling appellants' motion for judgment notwithstanding the verdict—that—W. S. Childerss was a good faith purchaser of the land involved in this suit, without notice of the equitable title of —L. A. Buckalew, et al., because the uncontradicted proof—shows that as a matter of law Childerss had such notice as to prevent him from acquiring the title of the heirs of Ellen Buckalew—".

Whether defendant Childerss bought the land from N. R. Dobson in 1931 in good faith, without notice of the community interest claimed by the Buckalew heirs, was submitted to the jury in five Special Issues in response to which the jury found that the preponderance of the evidence did not show: (Issue 1) that Childerss did not purchase the land in good faith; or (Issue 2) that when he purchased the land, Childerss acted with notice of the title of the Buckalew children (Notice was defined as being either actual, or as constructive where had by purchaser's attorney or was apparent of record in purchaser's chain of title); (Issue 3) that when the deed from Dobson to Childerss was executed and delivered, Childerss had notice or knowledge of facts sufficient to put him upon inquiry as to the title of the Buckalew heirs; or

(Issue 4) that Childerss did not exercise that degree of diligence which an ordinarily prudent person would have exercised in making inquiry as to the title of the Buckalew heirs; or (Issue 5) that reasonable inquiry by Childerss would have disclosed the existence and nature of the title of the Buckalew heirs.

The Buckalew heirs filed a motion for judgment notwithstanding these five findings, which was overruled.

The relevant proof may be summarized as follows:

(1) On January 1, 1900, the date of the deed from N. R. Dobson to J. A. Buckalew, the said J. A. Buckalew and his wife, Ellen Buckalew, and their children were residing upon the land in suit as tenants of the said N. R. Dobson, and they had been residing upon, using and occupying this land (and land upon the Taylor survey, adjoining upon the south) as Mr. Dobson's tenants for several years, perhaps four or five years, before this deed was made. Mr. and Mrs. Buckalew continued to reside upon the land in suit until Mrs. Buckalew's death, which occurred in 1903, and thereafter, Mr. Buckalew and some of his children continued to reside upon the land in suit until a short time after the deed of October 26, 1911, from Mr. Buckalew to G. W. Wright.

The Buckalew improvements consisted of a house, various barns, and a field, of which a small part was on the land in suit and the balance was on the Taylor survey, on the south.

(2) Shortly after J. A. Buckalew's deed to G. W. Wright, Mr. Buckalew and such of his children as remained with him left the community in which the land in suit was situated, and went to West Texas, where Mr. Buckalew spent the remainder of his life, apparently with children of his who had previously settled there. Mr. Buckalew died in 1923.

Walter Townes, a son-in-law of G. W. Wright, who became Mr. Wright's tenant of the land after Mr. Buckalew moved off the land, said that he took up residence on the land as Mr. Wright's tenant during the Fall of 1911, not long after he harvested a crop he had grown elsewhere.

After Mr. Buckalew made his deed to G. W. Wright and left his residence upon the land in suit, no member of the Buckalew family resided upon or near this land, or in the community where this land lay, and after a year or so, 1914 at the latest, none of the family resided in the county where the land lay, although some of them had made casual visits to the county at irregular intervals over the years since.

None of Ellen Buckalew's heirs asserted claim to any interest in the land in suit until shortly before they filed the present action.

(3) Walter Townes resided upon the land as G. W. Wright's tenant for about five years; he moved off the land about Christmas, 1916, and, apparently not long after, left the county with his family.

The land remained unoccupied after he left it until defendant Childerss took possession of it, after his purchase of it in 1931. The house in which the Buckalew and Townes families had resided was destroyed, either by fire or by decay, and the other structures also vanished. Joe West said that during the cotton picking season in 1914, when Walter Townes still resided on the land, the improvements were in bad repair. V. W. McMurrey found only the remains of an old field in 1923; he had no recollection of any other improvements. Defendant Childerss, when he surveyed the boundaries of the land Dobson conveyed to him in 1931, a day or so before the date of Dobson's deed to him, saw only some bricks and old stones, which may have served as foundation stones for the chimney or the house. Mr. Dobson said that there were no houses on the land when he conveyed the land to Childerss. He also said that the residence burned after Townes left; he did not know exactly when "but it wasn't so long, and it wasn't right recently after he left". W. B. Hensbro was upon the land shortly after production of oil began (this occurred in December, 1945), and was not able to perceive much evidence of a field; he said that pine saplings had grown up, large enough for pulp wood, in the area once covered by the Buckalew field.

Townes' fences rotted down or fell down evidently, before V. W. McMurrey viewed

the land in 1923, and the land was not fenced thereafter until defendant Childerss erected his fences, subsequent to 1931. Mr. Childerss said that the land was not fenced when be bought it.

(4) The land in suit was known in the surrounding community as "the Buckalew place" while J. A. Buckalew and his family resided upon it, and it has been so known ever since that time.

Defendant Childerss denied that he was acquainted with this community reputation before he acquired the land, and there is nothing to show that he did, except such opportunities for learning of this reputation as inhered in his travels about the county as County Agent and County Judge. The dates he held these officers are referred to hereinafter. Dobson said that Childerss' work as County Agent took him into the community where the land was, but he did not know how often.

(5) The land is referred to as "the Buckalew tract" in the deed to defendant Childerss from Dobson and wife. This deed, purportedly conveying some 200 acres of land, divided into three tracts, contains the following: "First Tract: Being 90 72/100 acres of land, embracing a 40 acre tract known as the Buckalew tract and 50 and 72/100 acres, a part of a 262½ acre tract made for N. R. Dobson, said 90 and 72/100 acres a part of the W. M. Logan survey, and described as follows".

Whence came this description of a 90.72 acres tract, and of the land in suit as a part of that tract is not shown. This description does not appear in any other instrument in Childerss' chain of title. The only matters of record which might account for the land being referred to in Dobson's deed to Childerss as the Buckalew tract are, first, the fact that the land had been conveyed to J. A. Buckalew (in 1900), and second, a reference to the land in the deed to Hines from the widow and heirs of Wright as "the same land conveyed to G. W. Wright by J. A. Buckalew by deed," etc. It seems improbable that the land was referred to in Dobson's deed to Childerss as "the Buckalew tract" because the land was known by that name in the community where it lay; otherwise, similar descrip-

tions would be expected in Hines' deed to V. W. McMurrey, or in the latter's deed to Wm. McMurrey, or in the latter's conveyance to Dobson. Such descriptions do not appear in those deeds.

The oil and gas lease from Childerss and wife to Gordon, and instruments in the chain of title under that lease contain the description of the 90.72 acres tract just referred to, with the reference therein to the land as "the Buckalew tract", but these instruments may be disregarded because made after (long after) Childerss took title to the land.

(6) Defendant Childerss first came to San Jacinto County on April 3, 1918, as County Agricultural Agent, and he resided in the County and served the County in that capacity for about 7 years. In February, 1925, he was transferred to Burleson County as Agricultural Agent for that County, and so moved his residence to that County. He returned to San Jacinto County in 1930, was elected County Judge of the County during that year, and held office during 1931 and 1932. It was during 1931 that he took title to the land. In March, 1933, he was re-appointed County Agricultural Agent for both Polk and San Jacinto Counties, and he served in that capacity until November, 1933. His appointment was then limited to Polk County, and he accordingly took up residence in that County during that month. After the suit was filed he returned to San Jacinto County, and when this cause was tried he resided not far from the land now in suit. However, he returned from time to time to the land while he resided in Polk County, presumably on such occasions as he deemed necessary for the proper management of the land.

(7) Defendant Childerss said that he came to acquire the land in this way: N. R. Dobson approached him and offered to sell him 200 acres of land if Childerss would pay a debt Dobson owed the Federal Land Bank. There is some evidence that Dobson acted under the pressure of necessity. Childerss testified: "Well, this deal was closed pretty quick and I don't know for what reason except Mr. Dobson had a payment coming due and they were threat-

ening foreclosure, and I had to meet the situation to stop the foreclosure." The land offered Childerss by Dobson was in two parts, separated by other land which Dobson owned; one part contained about 30 acres. Childerss did not want this 200 acres because it was divided in this way. The land in suit adjoined the larger of the two blocks offered him by Dobson, and had an abundant source of water on it (a creek), and after inquiring from Dobson who owned the land in suit, and being told by Dobson that Wm. McMurrey did, he suggested to Dobson that Dobson procure from McMurrey a conveyance of the land in suit, in exchange for the 30 acres block of the 200 acres Dobson had offered him; he would then buy 200 acres from Dobson, including the land in suit. Dobson agreed, and he and Childerss then called on McMurrey and procured McMurrey to make the desired exchange with Dobson.

The record shows that to effect this exchange and Dobson's sale to Childerss, two deeds were prepared, which Dobson said were executed and delivered at the same time, as one transaction, one being a deed of exchange between Dobson and McMurrey transferring title to the 30 acres and to the land in suit, and one being a conveyance from Dobson to Childerss. Both instruments have been listed above. These conveyances were prepared by Wm. McMurrey, who was a lawyer.

Mr. Dobson said that there were three deeds, one from him to McMurrey, one from McMurrey to him, and one from him to Childerss. Nevertheless, he was mistaken. Mr. Dobson confirmed, to some extent, Mr Childerss' statements as to how he came to acquire the land. He said that Childerss wanted the land in suit because it adjoined the creek, because Childerss wanted "to come up to the creek on both sides", and that Childerss wanted the land for a fish pond. However, he thought that Childerss already knew who owned the land in suit, which is inconsistent with Childerss' statement that Dobson gave him this information.

(8) Defendant Childerss never knew J. A. Buckalew and Ellen Buckalew, and there is no evidence that he knew any of the Ellen Buckalew heirs before this litigation arose. Witness L. A. Buckalew said that he became acquainted with defendant Childerss during the Spring of 1947.

Defendant Childerss did not know that Mrs. Ellen Buckalew was buried in a cemetery at Cold Spring.

There is some evidence, however, that defendant Childerss knew of a claim to the Ellen Buckalew community interest in the land in suit before Dobson conveyed it to him. Elgin Matthews testified that he wished to purchase some oil royalty from Childerss after the land acquired a mineral value; that Childerss' price was too high; and that he told Childerss so and also told him what he had heard one Hansbro say about the Ellen Buckalew heirs having "a claim in there". He testified further: "He (referring to Childerss) said, well, there is a tax judgment that done away with that; that him and Billy McMurrey had that discussion when he bought it.—And I asked him how did Butcher-Arthur pass the title, and he said they passed it on that same opinion about the tax judgment." And further; "Q. —Did I understand you to say that Mr. Childerss told you at the time he acquired the 40 acres he talked to Judge Billy McMurrey about the Buckalew heirs? A. Yes, sir, that is right." And that (according to Childerss) Judge Billy McMurrey had thought that it was cut off by the tax judgment.

Defendant Childerss was never interrogated about any conversation with the witness Matthews, but testimony of his now to be set out made a clear issue as to whether he had actual notice of the Buckalew claim when he took title to the land.

We note, in passing, that on September 17, 1930, a tax judgment was rendered by the District Court of San Jacinto County against Wm. McMurrey, and against his wife and the Federal Land Bank of Houston as well, in favor of the State of Texas, for $975.66 State and County taxes; this judgment foreclosed the tax lien on various tracts, including 40 acres in the William Logan Survey. On the date of this judgment Wm. McMurrey owned the land in suit (under our assumption that N. R. Dobson was common source of title), and

the 40 acres referred to in the judgment was doubtless the land in suit. However, this judgment was never carried into execution, and defendant Childerss himself eventually paid the taxes which Wm. McMurrey owed upon this land, as will hereinafter appear.

(9) Defendant Childerss testified, in effect, that he made no inquiries about the title to the land in suit, either of Dobson, McMurrey, or of any one else, and that he made no investigation of the records of San Jacinto County. He denied that he was represented by an attorney in the transactions with Dobson and McMurrey referred to above, and denied that McMurrey had ever represented him in the purchase and sale of property, although he said that he knew McMurrey intimately. He denied that McMurrey told him of any tax judgment or that he had asked McMurrey about a tax judgment. The following testimony by N. R. Dobson concerning a conversation between himself, Judge McMurrey and defendant Childerss confirms to some extent this testimony of defendant Childerss:

"Q. At the time you and Mr. Childerss went to his office to discuss with him the exchange of property, did you or not, or did you have any discussion with reference to the title to this 40 acres of land? A. No, sir.

"Q. Was there or not anything said about there being a judgment? A. No, sir.

"Q. A tax judgment? A. No, sir.

"Q. Was there any inquiry made about the title at all by any person? A. No, sir, not that I know a thing about." He said (defendant Childerss), too, that he had made no inquiries about Buckalew, or about the Buckalew family, or as to why the land was called the Buckalew place. He explained his failure to inquire about the title by saying that he thought the land in suit was of little value; that he was primarily interested in the remainder of the land he got from Dobson, and that he did make some inquiries about the title to that other land. He also said, as pointed out above, that he did not know until after he bought the land that the land was known as the Buckalew place.

There was some evidence, from Childerss himself, in conflict with these denials. In another action he gave the following testimony, on deposition:

"Q. (What steps did he take to check Dobson's title?) A. I was interested, of course, in the 109 acres. That was the best part—and I looked a little bit into that, and this 40 acre baygall, as he called it." (This 40 acres was the land in suit.) He did not check the records on that.

"Q. What did you check? A. I talked to two or three people there at the court house and they said they thought that that was all right and it was a tax suit filed on it, and they said it went through, and if I paid the tax suit on it, McMurrey told me I wouldn't have to make up an abstract, and I had the tax suit filed on it and if I paid the taxes, he would give me a good tax title, and I didn't think much of the situation. There was no question about it, and, as I said, the bay gall, we didn't put so much importance to it."

As previously stated, he said that he knew Wm. McMurrey intimately. Mr. McMurrey had succeeded him in 1925, when he had been transferred to Burleson County, as Secretary-Treasurer of the local Federal Farm Loan Association, which Mr. Childerss said he had founded. We note the following testimony of Mr. Childerss concerning his conversations with McMurrey, which also indicates to some extent why he did not inquire about the title to the land. "I rather figured that he (referring to McMurrey) was a good title man and that he had taken care of himself when he had purchased it. I said to him after the deal was through—it was just after the deal was closed, I said something about an abstract, or did I need it. He said, no, I don't think you will. He said, if you pay the taxes up on it you will have a good title." And further:

"Q. (Why did he ask about an abstract?) A. Well, I was thinking about having him to make it if he thought I needed it. He said, I don't think you need it—

I guess he figured I wanted it on credit. He said, if you pay the taxes up on this you will have a good title. And that was all. As far as a judgment, or for him giving me a certificate, that was not mentioned, I am sure." And further:

"Q. (Did he rely on McMurrey's statement that he would get a good title if he paid the taxes?) A. Not for the purchase of the land. I had already purchased it. Really, I thought some time when I was able I would have an abstract made, but I passed it up at that time."

(10) Neither did defendant Childerss make any extensive investigation of the possession of the land in suit. However, he did have the boundaries of the land which Dobson sold to him surveyed a day or so before the date of Dobson's deed to him, and during this survey he had observed some evidences of a former habitation. "There was a pile of brick they told me was where an old chimney had been." He said that he saw some old blocks or rocks there. The land was not fenced at that time, and, as has been stated, was not occupied. Dobson said that when he conveyed to Childerss there weren't any old houses on the land. The old field was there and he "guessed" that "the rocks are still there that they used for blocks and the old mud chimney." The rocks were used as the foundation of that chimney and for blocks under the cribs; "I guess they were out there."

(11) Defendant Childerss professed to know little or nothing about the title to the land in suit when he acquired that land. He said that he didn't know that Wm. McMurrey had acquired this land from V. W. McMurrey, or that Dobson was in the chain of title. He said that he didn't know that the land was known as the Buckalew land until after the purchase; his deed does refer to it as the Buckalew tract but this is consistent with his ignorance of a community reputation.

"Q. (Dobson) didn't tell you he had once owned and sold it to Mr. Buckalew and Mr. Buckalew had lived on it? A. No, sir, I didn't know he had owned it the second time until the discussion of these suits was brought up."

However, he also said: "Well, I relied on the old settlers and people (in purchasing property). I knew a little something, not much; and it looked like the property I was buying had come through good hands and I never questioned it". This statement seems to refer to his purchase of the land in suit.

He said, too: "I considered my title was good (when he came to erect fences). I never thought about anything else. And, of course, I thought I owned all the land I bought from Dobson."

(12) Defendant Childerss paid value for the land. Dobson's deed to him defines the consideration for the conveyance as: (1) assumption of Dobson's indebtedness to the Federal Land Bank of Houston, totalling $962.54, secured by a deed of trust dated May 7, 1925, which covered land conveyed by Dobson, other than the land in suit, and (2) assumption of all taxes charged against the land conveyed. The proof does not show what these taxes amounted to, but does show that Childerss paid taxes for three years, namely, 1929, 1930 and 1931. Dobson retained a vendor's lien to secure the payment of these sums. All of the indebtedness assumed was paid by Childerss. The Federal Land Bank formally released their lien on February 17, 1945; Childerss said that: "I had been paying on it all the time, and whatever was left over at that date, I paid it in full." Prior to 1935, all taxes levied on the land seem to have been collected by San Jacinto County, and Childerss paid the taxes for 1929 and 1930 on December 31, 1932; the taxes for 1931 were "paid through compromise judgment 7/26/37."

If Childerss did not have notice of the claim of the Buckalew heirs when he took title to the land, there is no evidence that he received notice of that claim before he paid the sums owed for taxes and owed the Federal Land Bank. There is some indication that he did not learn of the Buckalew claim until after he had paid these sums. The last payment made by him was made to the Bank in February, 1945. He said that he had a telephone conversation with Mrs. McPherson, one of the Wright heirs, during the latter part

of 1945 or early part of 1946, and he seems to have learned of the possibility of a claim by the Buckalew heirs not long before that.

(13) It cannot be said as a matter of law, if at all, that Childerss paid an inadequate sum for the land conveyed to him by Dobson. The value of this land, at the time of the conveyance to Childerss, was not proved, nor was the character and quality of this land, that is, the 200 acres. There is some information in the record indicating that the land in suit was valuable only for timber; what the rest of the land conveyed to Childerss was valuable for was not shown. Childerss said that when he bought this land he could have bought other land in that area for $3.50 an acre; he paid not less than $5 an acre for what he got. He said also that he attached little value to the land in suit. McMurrey seems to have readily agreed to exchange the 40 acres in suit for some 30 acres located elsewhere; the value and character of this 30 acres was not proved. Childerss seems to have sold some $400 worth of timber off the entire 200 acres conveyed to him a few years after he got it, but the record does not show how much of this came off the land in suit; Childerss' next timber cutting was not until 1940 or 1942 or later.

We overrule Buckalew Point 3 upon the following grounds:

■ As between J. A. Buckalew and his wife, Ellen Buckalew, legal title to the land now in suit vested in J. A. Buckalew under the deed to him from Dobson, and Mrs. Buckalew's community interest, for such interest she had, was, and now is, to be treated as in the nature of an equitable title. Legal title and equitable title are used here in the sense given them in applying the equitable doctrine protecting an innocent purchaser, for value. Patty v. Middleton, 82 Tex. 586, 17 S.W. 909; Strong v. Strong, 128 Tex. 470, 98 S.W. 2d 346, 109 A.L.R. 739.

The legal title vested in J. A. Buckalew was conveyed by him to G. W. Wright, and passed from Wright to his successors in title through the chain of title set out above, and is now vested in defendant

Childerss and the other appellees claiming lease hold and other mineral interests under him.

Thus the burden of proof rested upon the Buckalew heirs to show not only that defendant Childerss either took title with notice of Ellen Buckalew's community interest in the land or did not acquire that title in good faith, but also to show that each of his predecessors in title, beginning with G. W. Wright, also had such notice or took title in bad faith. Patty v. Middleton, 82 Tex. 586, 17 S.W. 909; Hill v. Moore, 62 Tex. 610; Mitchell v. Schofield, 106 Tex. 512, 171 S.W. 1121; Howard v. Commonwealth Building & Loan Ass'n, 127 Tex. 365, 94 S.W.2d 144.

■ Whether defendant Childerss had actual notice when he took title to the land that Ellen Buckalew's heirs had an interest in the land was plainly a question of fact, for the jury. The substance of Elgin Matthews' testimony was denied by Childerss, and Matthews' testimony was the only direct proof that Childerss had such actual notice at the time he took title. And if Childerss did not have such notice when Dobson conveyed the land to him, then it was certainly not proved as a matter of law that he received actual notice of the Buckalew claim before he paid the consideration he had agreed to pay for the land.

■ Ellen Buckalew's community interest was not apparent of record; the conveyance to her husband showed only that title was conveyed to him and thus did not put defendant Childerss on inquiry as to a possible community interest. Patty v. Middleton, 82 Tex. 586, 17 S.W. 909.

Appellants say that Wm. McMurrey acted in behalf of Childerss, as Childerss' lawyer, in Childerss' acquisition of title to the land, and that Childerss was accordingly charged with knowledge concerning the Ellen Buckalew interest which they say that Wm. McMurrey then had. However, it was not proved that Wm. McMurrey acted in such a capacity. McMurrey's services were limited to the preparation of two deeds; he acted otherwise as a seller, in his own behalf, and not as a lawyer representing Childerss. Defendant Childerss denied that McMurrey represented

him. We have concluded, further, as hereinafter appears, that the proof does not show as a matter of law that McMurrey was put on inquiry concerning the Ellen Buckalew community interest.

The only question remaining under Buckalew Point 3 is whether Childerss took title in good faith, or whether the rule in *Houston Oil Co. v. Hayden*, 104 Tex. 175, at page 182, 135 S.W. 1149, is to be applied to him. We have concluded that he was not put upon inquiry as a matter of law, if at all.

■ We attach no independent evidentiary significance to defendant Childerss' failure to investigate the title to the land. Childerss explained this conduct and the only consequence of his failure to investigate is that he must be charged with knowledge of such facts as he would have discovered if he had made the investigation required of him.

■ He was only bound: (1) to investigate the records of instruments affecting the title to the land, (2) to determine whether the land was in possession, and if it was, what rights were claimed by the possessor, and (3), according to *Hill v. Moore*, 62 Tex. 610, at page 615, to pursue the inquiry suggested by any fact known to him which "would have prompted a prudent man, desirous to protect himself and willing to act fairly with others" to make a further investigation of the title and which, if followed up "would have led to the knowledge of the equitable right of the appellants." See also: *Paris Grocer Co. v. W. H. Burks*, 101 Tex. 106, at page 111, 105 S.W. 174, 175; *Strong v. Strong*, 128 Tex. 470, 98 S.W.2d 346, 109 A.L.R. 739; *Bounds v. Little*, 75 Tex. 316, 12 S.W. 1109.

■ Had defendant Childerss read the records prior to his deed, he would have seen nothing suggesting any outstanding community interest. No one was in possession of the land, and all he saw was some evidence of former habitation by some unidentified person. It was not proved as a matter of law that he knew before he took title to the land that the land was known in the surrounding community as "the Buckalew place". See *LeBlanc v.*

*Jackson*, Tex.Com.App., 210 S.W. 687; *Strong v. Strong*, 128 Tex. 470, 98 S.W. 2d 346, 109 A.L.R. 739. Childerss' deed from Dobson, of course, referred to the land as "the Buckalew tract", but the suggestive force of this recitation is weakened by (a) the fact that the land had been conveyed to a person named Buckalew, and (b) the reference to the land in the deed to Hines as "the same land conveyed to G. W. Wright by J. A. Buckalew". The price paid was not shown to be "so grossly inadequate that it would call attention to the fact that there must be some defect in the title, or that the conveyance was made for improper purposes, as to defraud creditors", within the sense of the language used in *Hume v. Ware*, 87 Tex. 380, at page 384, 28 S.W. 935, 936. These few circumstances constitute the proof on which must rest a finding that Childress acted in bad faith regarding the Buckalew claim and according to the decisions now to be cited, these circumstances do not prove such bad faith unless it is suggested thereby that J. A. Buckalew was married when Dobson conveyed the property to him. We hold that this proof did not, as a matter of law, if at all put Childress on inquiry concerning the estate vested in Ellen Buckalew. See *Gilmer's Estate v. Veatch*, 102 Tex. 384, 117 S.W. 430; *LeBlanc v. Jackson*, Tex.Com.App., 210 S. W. 687, at page 693; *Griggs v. Houston Oil Co.*, Tex.Com.App., 213 S.W. 261; *Pouncey v. May*, 76 Tex. 565, 13 S.W. 383; *Hall v. Gwynne*, 4 Tex.Civ.App. 109, 23 S.W. 289; *McBride v. Moore*, Tex.Civ. App., 37 S.W. 450; *Mangum v. White*, 16 Tex. Civ.App. 254, 41 S.W. 80; *Nelson v. Bridge*, 39 Tex.Civ.App. 283, 87 S.W. 885; *Wallis, Landes & Co. v. Dehart*, Tex.Civ. App., 108 S.W. 180; *Clayborn v. Gambill*, Tex.Civ.App., 87 S.W.2d 508; *Brown v. Stumpff*, Tex.Civ.App., 123 S.W.2d 806; *Bordages v. Stanolind Oil & Gas Co.*, Tex. Civ.App., 129 S.W.2d 786; *McClenny v. Humble Oil & Refining Co.*, Tex.Civ.App., 179 S.W.2d 798. And see: *Strong v. Strong*, 128 Tex. 470, 98 S.W.2d 346, at page 349, 109 A.L.R. 739; *Howard v. Commonwealth Building & Loan Ass'n*, 127 Tex. 365, 94 S.W.2d 144, 145 ("There was a finding that one or possibly two vendees

or lienholders in the chain of title had notice of the former marriage of Bluitt, but there was no finding that any of them knew that the property had been community property of Bluitt and his first wife."); Hill v. Moore, 62 Tex. 610, at page 614 ("So far as the record shows the certificate in question may have been issued to some person other than Jowell, and by him afterwards purchased; if so, the simple fact that it may have been transferred to him would not put a purchaser upon inquiry, from the fact that it was such a certificate as could issue only to the head of a family, whether Jowell had a wife at the time he purchased. A single man as well as the head of a family could deal in such certificates, and no presumption of family, or not, could possibly arise from the fact that a man by purchase became the owner of a land certificate which could only issue to the head of a family."); Jackson v. DeGuerin, 124 Tex. 424, 77 S.W.2d 1041; Kirby Lumber Co. v. Temple Lumber Co., 125 Tex. 284, 83 S.W.2d 638.

The real issue between defendant Childerss and the Buckalew heirs was whether Childerss had actual notice of Ellen Buckalew's community interest when he took title to the land, not whether he took that title in bad faith.

■ Buckalew's Point 3 must also be overruled because the proof does not show as a matter of law that two of Childerss' predecessors in title, namely, V. W. McMurrey and Wm. McMurrey, had notice of, or were put upon inquiry concerning, the Ellen Buckalew interest when they acquired their title to the land, and these matters were not submitted to the jury.

The evidence concerning V. W. McMurrey shows:

(1) He was born in San Jacinto County and, excepting a five year period, had always lived in the County.

He was born in 1894—and was thus only about 6 years old when J. A. Buckalew bought the land, only about 9 years old when Mrs. Buckalew died, and only about 17 years old when J. A. Buckalew sold the land to Wright and moved away. He was about 29 years old when he bought the land. His family resided on the out-skirts of Cold Springs, which was some 4 miles from the land. His father was a farmer.

(2) He had been on the land twice, he thought, once before and once after his purchase. He had no recollection of seeing any improvements on the land, but did see the remains of an old field.

He testified:

"Q. During the early years back prior to that time (prior to his purchase) had you or not heard or learned of the Buckalew family who lived in that part of the County? A. I heard of them, but I never did know any of them. I never had been down there, so I didn't know anything about them.

"Q. You say you had heard of them? A. Yes, sir.

"Q. You didn't know whether they lived on that tract or on another tract at that time? (the time before he purchased) A. No, sir.

"Q. Was it your understanding that they lived in that general area, the family? (that is, had lived) A. That is right." And further:

"Q. You didn't know—L. A. Buckalew personally until recently? A. That is right.

"Q. But you say you did know of a Buckalew family that lived down in that area? (that is, had lived) A. That is right." It is undisputed that the Buckalew family had left the land and the County many years before V. W. McMurrey bought the land.

(3) The deeds in his chain of title do not refer to the land as "the Buckalew tract"; that reference first appears in Dobson's deed to Childerss.

(4) He paid only $100 for the land, $2.-50 per acre, but there was evidence that this was a reasonable price at the time of his purchase. He bought the land in 1923, and the witness J. P. Richards said that timber on the land was sold by Hines in 1922. The witness Joe West said that the land was valuable chiefly for timber, that it had little value as a farm, that it was not good cattle pasturage unless it was fenced and the brush cleared, but that it

would be a good hog range. He further testified:

"Q. (What would the land have been worth a year or two after the timber was cut?) A. If a fellow had got $5 it would have been just like it was given to him. It was not worth it.—

"Q. What would have been a fair or reasonable price? A. $2.50 per acre would have been plenty. That would have been a fair price after the timber was cut and no oil or anything like that. That value of it was little."

(5) His uncle, Wm. McMurrey, hereinabove referred to, acted as his lawyer in preparing the Hines deed to him in 1923, and in "in the consummation of that deal for the tract" he bought from Hines.

(6) The evidence does not show whether any inquiry concerning the title to the land was, or was not made by, or in behalf of, V. W. McMurrey.

Wm. McMurrey was dead when this cause was tried. The evidence concerning him shows:

(1) He seems to have spent his life in San Jacinto County, residing all the while at Cold Springs.

(2) In 1903 and prior years, he and his brother Julian McMurrey operated a merchandise store in Cold Springs, and J. A. Buckalew and Ellen Buckalew and their family were among the customers of this store and were acquainted with Wm. McMurrey. V. W. McMurrey said that Wm. and Julian McMurrey were operating this store at his earliest recollection, which would probably be about 1900, the year during which J. A. Buckalew acquired the land from N. R. Dobson. However, the evidence does not clearly show whether the Buckalew family were customers of the McMurreys at that time or not; at most, it was for the jury to decide.

Cold Springs was only a village during Mrs. Buckalew's lifetime, having a population of less than 1,000 inhabitants, and Joe West testified that there were "something like a half a dozen stores" in 1903. The town was the trading center for the surrounding area, and as stated, the land in suit lay some four miles from the town.

Mr. and Mrs. Buckalew traded elsewhere than with Wm. McMurrey. L. A. Buckalew said that his father and mother had charge accounts at two other stores.

(3) Wm. McMurrey began to practice law about 1906. W. B. Hansbro said that he returned to Cold Springs in 1906, and that Wm. McMurrey began to practice law soon thereafter. Whether he retained any connection with the store is not shown. In 1923, his profession was his means of livelihood.

Mr. McMurrey once served as County Judge of San Jacinto County, but when he did was not proved.

(4) He is not shown to have known the Buckalew family except as customers of his store. When his connection with that store ceased is not clear, and whether J. A. Buckalew continued to patronize the store after Ellen Buckalew's death is also not clear.

(5) It does not appear that Wm. McMurrey ever went upon or around the land while J. A. Buckalew was there, or at any other time, and we have no information concerning his knowledge or investigation of the title to the land.

Under these circumstances and the decisions cited above it cannot be held as a matter of law that either V. W. McMurrey, who acquired the land from P. M. Hines on February 23, 1923, or that his uncle Wm. McMurrey, who acquired the land from him on June 27, 1924, had notice of or were put upon inquiry concerning the Ellen Buckalew community interest. The most significant circumstance is Wm. McMurrey's acquaintance with the Buckalew family, and concerning that we note that J. A. Buckalew's deed to Wright is dated October 26, 1911, over 11 years before the deed to V. W. McMurrey and over 12 years before the deed to Wm. McMurrey and Buckalew left the county very shortly thereafter. Is Wm. McMurrey to be charged as a matter of law with knowing that J. A. Buckalew, grantee of N. R. Dobson, was his former customer? If so, he must be so charged regarding every customer his store had, other than casual purchasers, and this seems an unreasonable burden to impose upon him as

a matter of law. Whether his client was to be charged with his knowledge, acquired before his employment began, is a matter we have not considered.

■ Buckalew Point 1 assigns error to the trial court's order overruling the motion for new trial "because of the misconduct of the jury in voting upon and agreeing in advance of a final vote on the special issues that the appellee should prevail in this suit and proceeding to answer the special issues so as to carry out the general agreement previously reached to give the property to Childerss."

The motion for new trial pleaded the misconduct referred to in Buckalew Point 1, and the trial court's order overruling this motion was based upon a hearing at which only two jurors, namely, Chris Pitman and Owen Pitman, testified. Each of these jurors said that upon retiring to the jury room at the conclusion of the trial, the jury first elected a foreman, Fox Kelley, and then adjourned to eat a meal. After they returned, the foreman announced that he did not have his glasses and for that reason procured another juror, one Counts, to read the charge to the jury. Owen Pitman said that another juryman also read it for himself. The events on which appellants base their claim of misconduct occurred subsequently; the relevant testimony follows:

Chris Pitman testified (under examination by counsel for Wright heirs) that Mr. Kelley, the foreman, said; "that he didn't have his glasses, that he couldn't see it (the charge) and he appointed Mr. Counts to read it. After Mr. Counts got through reading, well, he says, now * * * Mr. Kelley did * * * says now all in favor of Childerss raise your right hand. And Eleven of them raised their right hands then and one of the boys held back just a little. He didn't come up. He says, well, if all the rest has voted that way I guess I might as well. Mr. Kelley says, no, if you don't see it that way, no, you don't vote. He says, that is the way I am going to vote, so he put his hand up." After that statement was made Mr. Kelley read every one of the questions separately from each other one.

"Q. Did he write those answers down as he asked you? A. Yes, sir.

"Q. That was after the Statement was made that all of those in favor of Mr. Childerss raise your right hand? After he did that. And we all raised our right hands. He wrote that statement * * * every body, and as we come on down every time they taken a vote they wrote that down." They voted on the issues separately.

"Q. But that was after this question was asked who all was in favor of Mr. Childerss? A. Yes, sir."

He then testified, under examination by counsel for Butcher-Arther, Inc.:

"Q. * * * did the jurors agree to answer the issues so as to favor Mr. Childerss even though that was against the evidence? A. I don't think it was done * * * I know it was not.

"Q. Is it your testimony that each issue was answered by the jury as they saw the evidence to be? A. Yes, sir."

He next testified, under examination by Buckalew counsel: After Mr. Counts had finished reading the issues, Mr. Kelley asked everybody in favor of Mr. Childerss to raise his right hand.

"Q. There was one dissenting man in the group, but he later joined in with the other eleven? A. That is right. Later he did. He didn't do it right then.

"Q. Now did Mr. Counts again for the second time read the issues or did he go ahead and write the answers in after everybody had agreed to give it to Mr. Childerss? A. The way he done, Mr. Liles, we would vote and he would write, and he would read on down and we would vote and he would write again. That is the way it was done all through * * * We read it all before we done anything and then we started voting on down.

"Q. Now the first 25 issues were all answered 'no'; is that your recollection? A. Well, I wouldn't know about that. At that time we was all * * * they all said them first 25 was just alike, the way I understood.

"Q. You knew if you answered .them 'no' you were finding for Mr. Childerss?

A. Well, I don't know just which way, but we were all for Mr. Childerss on the 25 questions.

"Q. And you were answering the issues so that Mr. Childerss would get the land? A. We was answering them according to way the evidence was in favor of Mr. Childerss getting it.

"Q. But you had agreed by vote before any issue was answered that you would give it to Mr. Childerss? A. It was all read and we taken a vote.

"Q. To give it to Mr. Childerss? A. Yes, sir.

"Q. And you proceeded to answer the issues to as to carry out that vote? A. Yes, sir."

He testified upon re-examination by counsel for Butcher-Arthur, Inc.:

"Q. Did anyone discuss what would be the effect upon the judgment if the issues were answered one way or the other? A. There was not anything asked about it until, you know, we would read and everybody taken a vote on which way. There was not anything like that discussed.

"Q. In other words, you all took a vote to see if you were in general accord and then as you answered each issue you all voted as you found the issues from the evidence? A. That is right.

"Q. And you didn't feel bound by your agreement * * * you didn't feel bound by your first vote that you favored Mr. Childerss to answer any particular issue either one way or the other? A. We voted on them all separately and everyone voted according to the way we saw each vote.

"Q. From the evidence? A. Yes, that is the way we did."

He testified on re-examination by Buckalew counsel:

"Q. And in support of the previous vote to give the land to Mr. Childress? A. That is right."

Owen Pitman testified under examination by Wright Counsel: After the jury returned to the jury room, from their meal, "Mr. Kelley, he said he couldn't read; he left his glasses, I believe, and didn't have them with him and he didn't mind being foreman but he had to appoint Mr. Counts or somebody to read it for him." Mr. Counts read the charge. "Another boy read it, too. I don't know what his name was. But he read it and we all could have if we wanted to." (What next occurred?) "Well, Mr. Kelley, he said we would all have a vote now, but he wanted them to vote according to the way they seen the evidence; that there was three of them in the suit. In other words, he was going to have a vote for Mr. Childerss first. All that seen the evidence in his favor vote, and them that didn't not vote. He asked the question, all those in favor of Mr. Childerss. He said, all that seen the evidence * * * you know, the evidence." They voted by raising the right hand." * * * there was twelve of them voted, but one man was a little bit slow, and he looked around and said, well if everybody else has voted I might as well to vote. Mr. Kelley stopped him and said, no, if you don't see the evidence that way you don't vote that way. And he said, well, that is the way I see it too.

"Q. Then did you answer the issues separately? A. Well, he would read them and * * * and then read and we all voted again separately and he would put it down.

"Q. How did you all vote in a manner to carry out your previous ballot to award the land to Mr. Childerss? A. I don't know if I understand that or not. The way I voted was the way I seen the evidence regardless of who it was for * * * not for Childerss more than anybody else, but the way I seen the evidence.

"Q. But you had previously voted, all of you in a group, to award the property to Mr. Childerss, had you not? A. Well, you know, he said if we seen the evidence in that favor he would have a vote on all three of them. When it first started.

"Q. That was before you took each issue and answered them individually? A. Yes, sir."

Under examination by counsel for Butcher-Arthur, Inc., he testified:

"Q. I believe you said you answered each issue according to the evidence as you saw it? A. That is right.

"Q. And that you made no agreement to answer the issues in any certain way in advance? A. No, not for no certain one. I just * * * I don't know whether * * * In other words, I was just going by the evidence.

"Q. And was there any discussion that you heard whereby anyone agreed to vote against the evidence in order to favor any particular party? A. No, sir. There was not nobody mentioned it."

Under examination by Buckalew counsel, he testified:

"Q. But before any of the issues were answered the entire 12 men had voted to give the land to Mr. Childerss? A. Yes.

"Q. That is right? A. Yes.

"Q. And you all proceeded to answer the issues as to carry out that vote you had taken? A. Mr. Kelley told them when he had them read, if it was not their evidence not to vote on it.

"Q. The question was; You all then voted to carry out the vote you had previously taken to award it to Childerss; that is correct, isn't it? A. Well, that is right."

Upon re-examination by counsel for Butcher-Arthur, Inc., he testified:

"Q. Explaining your last answer, your first vote in behalf of Mr. Childerss was your re-action to the evidence; that that correct? A. That is right. And he knew from the Judge's charge that it was not his duty to give the land or not; he was simply to answer questions.

"Q. Your first vote was sounding out general sentiment, is that your testimony? A. That is right." And each subsequent issue was voted on from the evidence as he saw it.

After this hearing, the trial court filed the following finding of fact: "I find as a fact that the jury, after retiring for its deliberations and after electing a foreman, first took a vote to see if they favored the plaintiffs or the defendants; that this vote was unanimous in favor of the defendant Childerss, and the jury answered the issues accordingly, but did not agree to be bound by this vote in answering the special issues; that the vote was simply a sampling of general sentiment; that thereupon each special issue was separately read and separately voted upon; that in casting his vote upon each issue each juror voted as he thought the issue should be answered from the evidence; that no juror answered any issue contrary to his belief as to the evidence; and that no juror answered any special issue so as to accomplish a certain legal result."

Appellants say that the elements of this finding are contradictory but we do not so construe them.

The basic element in the misconduct alleged by appellants is an agreement by the jury to return a verdict in favor of defendant Childerss; but the trial court plainly found that this agreement was not made. The trial court, instead, interpreted the evidence as showing only a "straw vote", expressing a general view of the jury which did not amount to an agreement to return a verdict for Childerss. The trial court also construed the evidence as showing that the verdict returned was actually in accord with the general opinion so expressed, but that this verdict represented the jury's view of the evidence and was not the result of an effort "to accomplish a certain legal result." These findings are consistent.

Buckalew Point 1 is overruled.

The facts found by the trial court do not show reversible error. That the sentiment expressed on the straw vote and the legal effect of the verdict coincided proves neither an unlawful agreement nor that the jurors were guided by a desire to accomplish a certain legal result. Monkey Grip Rubber Co. v. Walton, 122 Tex. 185, 53 S.W.2d 770; Waggoman v. Fort Worth Well Machinery & Supply Co., 124 Tex. 325, 76 S.W.2d 1005; Price v. Briscoe, 141 Tex. 159, 170 S.W.2d 729; Maryland Casualty Co. v. Hearks, 144 Tex. 317, 190 S.W.2d 62; Davis v. Christmas, Tex. Civ.App., 248 S.W. 126; Beaumont, S. L. & W. R. Co. v. Richmond, Tex.Civ.App., 78 S.W.2d 232; Booth v. H. P. Drought & Co., Tex.Civ.App., 89 S.W.2d 432; Jackson v. Connecticut General Life Ins. Co., Tex.Civ.App., 131 S.W.2d 177; Tumlinson v. San Antonio Brewing Ass'n, Tex.Civ.

App., 170 S.W.2d 620; Bauguss v. Bauguss, Tex.Civ.App., 186 S.W.2d 384.

 Buckalew Point 1 authorizes us only to determine whether there is any evidence supporting the trial court's finding. Concerning the issue, whether any misconduct actually occurred, the trial court is the trier of facts; and that court's finding on that issue bind this court. See decision cited above, and Blaugrund v. Gish, 142 Tex. 379, 179 S.W.2d 266.

The findings of the trial court are supported by the evidence. Both jurors said, in effect, that a foreman was elected, that the charge was then read, that the general vote was then taken, and that each of the Issues submitted was then considered and answered. They also said, in effect, that they made no agreement to find for defendant Childerss, that the vote was but a test of sentiment, that they did not discuss the legal effect of their answers, that the verdict represented the jury's construction of the evidence, and that the foreman insisted that their verdict be founded upon the evidence. Yet under examination by Buckalew counsel they gave testimony, hereinabouve quoted, which, considered alone, tends to show occurrence of the misconduct alleged.

 The trial court had authority to resolve the apparent conflict and conclude, as that court did, that the misconduct alleged did not occur. In addition to decisions cited above, see Pearson v. Doherty, 143 Tex. 64, 183 S.W.2d 453, at page 456 (Hn. 4); and Dallas Ry. & Terminal Co. v. Garrison, Tex.Com.App., 45 S.W.2d 185.

It also seems to us that there is some ground in the record for reconciling the testimony just summarized.

The decisions cited by appellants were made upon other evidence and are not thought to be in point.

Buckalew Point 2, to which we have not yet referred, attacks the sufficiency of the evidence to support the findings made under Issues 30 and 31, establishing a limitation title in defendant Childerss under the ten years statute. Our disposition of Buckalew Point 3 has made this matter immaterial, and we therefore need not decide it; the trial court's judgment against the Buck-

alew heirs may be affirmed on the findings discussed under Buckalew Point 3.

These comments dispose of the three Points of Error filed by the Buckalew heirs. The Wright heirs adopted Buckalew Points 1 and 2, which have already been considered, and filed only one independent Point of Error, their Point 3.

 Wright Point 3 reads: "The trial court erred in refusing to grant the motion of appellants, Ruth E. Wright McPherson and Ruby Wright Lilley for judgment against the appellee Childerss, notwithstanding the Jury's answers to Special Issues Nos. 26 through 29 because the uncontradicted and undisputed proof shows that both of these appellants were 17 and 14 years of age respectively and that this cause of action filed by them was instituted within a period of one year after it had become disclosed to and known to them that the record title to said premises had been placed in the appellee."

The deed which Mrs. McPherson and Wright executed was dated August 2, 1919, and the action filed by the Wright heirs was filed on March 26, 1947, over twenty six years later. If Mrs. McPherson was 17 years old when she signed the deed, as the Wright appellants say, and Mrs. Lilley only 14 years old at that time, then as Butcher-Arthur, Inc. say, the present action was filed "at least 20 years and 6 months after Mrs. Lilley became 21, and at least 23 years and 6 months after Mrs. McPherson became 21." The evidence does not show when these ladies were married.

The jury found: (Issue 28) that the description had been inserted in the deed to Hines from the widow and heirs of G. W. Wright prior to the execution and acknowledgement of said deed by various grantors, including Mrs. McPherson and Mrs. Lilley, and (Issue 29), that various of Hines' grantors, including Mrs. McPherson and Mrs. Lilley did agree to sell the 40 acre Buckalew tract to Hines. The Wright heirs contended on trial, as they had alleged in their petition, that the deed to Hines from Mrs. Wright and her children did not contain any description when it was executed and acknowledged, and that they

0<br>

never did agree to sell Hines the land in suit, that they agreed to sell him only another tract, containing some 55 acres. The findings referred to repudiate these contentions, and the sufficiency of the evidence to support said findings has not been attacked.

Wright Point 3 is overruled. We adopt the argument of Butcher-Arthur, Inc. that the disaffirmance by Mrs. McPherson and Mrs. Lilley was made after an unreasonable delay and that they are barred by lapse of time, as a matter of law.

These comments dispose of the Points of Error filed on this appeal. The judgment of the trial court is therefore affirmed.